IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS MITCHELL CASTILLO,<br><br>       Petitioner,<br><br>vs.<br><br>M. S. EVANS, Warden,<br><br>       Respondent. | No. C 06-4841 JSW (PR)<br><br>ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS |

### INTRODUCTION

Curtis M. Castillo, a prisoner of the State of California currently incarcerated at the Salinas Valley State Prison in Soledad, California, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court ordered Respondent to show cause as to why one claim raised in the petition should not be granted. Respondent filed an answer, a memorandum of points and authorities in support thereof, and exhibits. This order denies the petition for a writ of habeas corpus on the merits.

### PROCEDURAL BACKGROUND

Petitioner was convicted by jury trial in Monterey County Superior Court of forcible oral copulation, and was found to have prior convictions for robbery and rape. He was sentenced to 85 years to life in state prison.

Petitioner appealed his conviction to the California Court of Appeal, Sixth District, which affirmed the conviction in an unpublished, reasoned opinion filed February 1, 2005. On May 18, 2005, the California Supreme Court denied review. On

August 10, 2006, Petitioner filed the instant petition.

## **FACTUAL BACKGROUND**

The facts underlying the charged offenses, as found by the California Court of Appeal, are as follows:

> On the evening of March 5, 2001, Joanna was taken to Natividad Hospital by her brother and dropped off at the emergency room. Joanna had a history of alcoholism and had been drinking heavily. She also suffered from severe psoriasis, chest pains, alcohol withdrawal symptoms, and intermittent bleeding caused by liver disease. About 9:50 p.m., she was treated by a physician's assistant who gave her Librium to alleviate her alcohol withdrawal symptoms and instructed her to follow-up with her doctor.
>
> Joanna was discharged about 1:20 a.m. (March 6), and her brother was called to pick her up. After she waited outside the hospital for an hour or so, defendant drove up in his truck with music playing. Joanna told defendant that she liked the music and that she was waiting for a ride. She accepted his invitation to wait inside his truck and listen to music. Defendant was drinking rum and Coke, and shared it with her. Joanna noticed defendant's hospital employee identification tag hanging from the rearview mirror.
>
> After a while, they drove around the hospital to look for Joanna's brother, without success. Then they decided to drive to the brother's house, but Joanna could not remember exactly where it was. Defendant drove to his own house and parked down the street, telling Joanna to stay in the truck because he did not want his mother to see her. He returned with a bottle of rum. They drove back to the hospital, because defendant was running out of gas.
>
> Defendant asked Joanna if she would like to see the old abandoned portion of the hospital, which was adjacent to the new one. He said they could talk and drink inside. About 2 a.m., hospital security guard Percy Saucedo, a friend of defendant's, let them inside the old hospital. Saucedo thought the pair seemed intoxicated and acted like they were old friends, because they were standing very close together; she was nuzzling him .... Like they were just good friends, .... Joanna left her purse and her duffel bag in the truck because she did not expect to be staying long.
>
> Joanna and defendant went into room 111 of the old hospital, where they sat on separate beds and watched television. The two talked and the conversation became more romantic. Then Joanna went over to the bed defendant was sitting on. She admitted they French-kissed. But then, according to Joanna, defendant leaned into her and became forceful and aggressive. She reported telling defendant to "slow down," "I just met you," because things were going further than she wanted. But defendant did not stop. According to Joanna, defendant held her by her hair with one hand while he removed her sweatshirt, jean shirt and bra with his

2

other hand. Then he straddled her and removed her slip-on boots, loose-fitting jeans and panties. Joanna said she was scared and shocked, and tried to resist. She said she pushed her foot against the rail at the end of the bed. She said she hit defendant a few times (breaking her middle finger), and locked her ankles to prevent him from getting in between her legs. She said that he spread her legs apart and penetrated her vagina with his penis. She wanted him to stop, but he did not respect her requests. Joanna said that over the course of several hours, he penetrated her vagina three times with his penis, and once with his finger. When he put his penis in her mouth, she threatened to bite off his penis. Joanna also said that defendant cut off her hospital wristbands with a small pocketknife, which alarmed her. He told her that her "pussy was his now" and that she had "better not give it to anybody else" or he would kill her.

Apparently, defendant left the room sometime after 6 a.m. About 7:50 a.m., Lisa Calderon, an employee of the probation department, which was located near the old hospital building, noticed Joanna, who had her hood up and looked like she needed help. When Calderon approached, Joanna said she was looking for "Curt." Joanna then disappeared. She returned about two hours later. She told Calderon and Probation Officer Finnegan that defendant had sexually assaulted her in the old hospital. She took them back up to room 111 to show them the room. Officer Finnegan called the police.

When the police investigated the scene, they found the Coke bottle with the rum mixture and Joanna's bra hanging from the light fixture. Joanna told Officer Fairbanks that she tried to stop defendant but he threatened to kill her. She explained to Calderon and Fairbanks, " 'I know. I went willingly, but I didn't give up my body willingly.' " Joanna identified defendant from a photographic line-up. Initially, Joanna told the officer she did not want to press charges, she only wanted her purse (with her medications) back. Her purse and duffel bag were found that morning in front of the security office.

That afternoon, as Sergeant Gray was taking Joanna to the sexual assault examination room, they encountered defendant in his truck in the parking lot. Joanna said, " 'That's him.' " She seemed afraid and upset, and cowered down. Defendant looked at Joanna and Sergeant Gray. He then walked briskly away.

Defendant did not go to his physical therapy appointment that afternoon, and apparently left his fiancée at the hospital when they were supposed to meet after their appointments. He did not show up for work, and was arrested at his house.

A sexual assault examination was conducted on Joanna by Nurse Shiffman. She reported Joanna to be trembling and anxious, and said that her hair was "scrunched." Joanna told Shiffman that, at some point, defendant placed her hand on his penis and told her to feel it. Joanna described defendant's conduct in vaginally penetrating her and putting his penis in her mouth. She said he threatened to kill her. A physical exam showed that Joanna's neck was possibly bruised, and she had two

3

lacerations on her posterior fourchette, a common injury in a case of forceful sexual intercourse. Joanna could not tolerate the insertion of the speculum into her vagina, so Shiffman could not examine her cervix. However, she saw no symptoms of psoriasis around her vagina. At 5:45 p.m., Joanna's blood alcohol was .08 percent. Joanna reported being sore in her chest, neck, legs, abdomen, and vagina. An examination of defendant after he was arrested showed no apparent bruises or scratches.

Joanna was still sore several days later. She apparently had a fractured right foot and was in a cast for six weeks. Nurse Shiffman explained that sometimes rape victims become aware of other injuries some time after their sexual assault examination.

At trial, criminologist Walker testified to the test results on the clothing and swabs from Joanna and defendant. The tests showed that there was human blood in Joanna's vagina, on the crotch of her pants, on defendant's testicles, and on the front of his boxer shorts, but he could not determine the age of the stains.

Linda Barnard, an expert in sexual assault and rape trauma syndrome, testified about common behaviors of rape victims. She explained that rape victims are often fearful to talk about the rape, blame themselves, fear they will not be believed, are more traumatized if the perpetrator threatens them, and often delay reporting the rape.

Several defense witnesses, including friends and family of defendant, testified at trial. Dr. Laura Slaughter, an expert in sexual assault examinations, testified that Joanna's injuries could have been the result of her psoriasis and existing health problems. She also observed that the lacerations on the posterior fourchette could have been the result of Joanna's earlier catheterization for a urine sample when she was seen in the emergency room.

Percy Saucedo, the security guard at the old hospital, said defendant and Joanna were intoxicated when he let them into the building. He testified that, because he feared losing his job, he lied when he told the police he let them in because he was afraid of defendant. Saucedo and Sonny Velarde, another security guard who was defendant's cousin, stated that about 2:30 a.m., they had walked past room 111 and heard no noise. They also claimed they did not see defendant's truck outside. However, the security log records showed the two were patrolling in a different place at that time. The security guards claimed that the logs were not accurate, and were actually prepared in advance.

A former friend of Joanna's, Angela Dorio, testified that Joanna often gave an exaggerated version of events. Dorio further testified that Joanna never wore underwear. Dorio herself had been convicted of a number of theft-related offenses.

Also, at trial, two women testified about their assaults by defendant. (See Evid.Code, §§ 1101, 1108.) Susan testified that on September 25, 1992, defendant offered to pay her $50 for sex. She got in his car and they

4

> drove to a place where defendant stopped in a driveway and parked next to a tree blocking the door on the passenger side of the car. When he told her he had no money, she tried to get out, but could not. Defendant hit her in the face, put a knife against her throat, and threatened to cut her head off if she did not cooperate. She begged him not to hurt or kill her. He then raped her. Afterwards he told her that he had been convicted of this "three times" and needed help. She eventually ran, waved down a police officer and gave him defendant's license plate number. Her left eye was red and swollen. Susan later identified defendant from a photo line-up.
>
> Maureen testified that on October 25, 1992, she was drinking at a bar in San Francisco, met defendant and left with him. He stopped to buy beer, dropped his friend off and drove to the top of Twin Peaks where they drank. He tried to kiss her, but she was uncomfortable and told him she would go out with him some other time. As he was driving her home, he stopped his car next to a hillside blocking the door on her side of the car. He then put a knife to her throat, and told her to take her "fucking clothes off, bitch." When she cried and refused, he threatened to kill her and locked the door. She then cooperated and he raped her. As they were driving, a police officer stopped the car. Maureen told the officer that defendant had just raped her at knifepoint and threatened to kill her. The officer found a pair of scissors in the car. Maureen had a significant injury to her posterior fourchette. For this assault, defendant served time in prison until January 1997.

*People v. Castillo*, No. H026086, 2005 WL 236837 (Cal. Ct. App. Feb. 1, 2005, as modified on denial of rehearing Mar. 3, 2005), at *1-4.

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

5

       Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

       "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

       In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

If the state court decision only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.

In his petition for a writ of habeas corpus, Petitioner asserts the following claim for relief: the trial court, by failing to provide a jury instruction on Petitioner's defense, violated his right to a fair trial under the Fifth, Sixth and Fourteenth Amendments.

## **DISCUSSION**

### 1. **Jury Instructions**

Petitioner claims that the trial court violated his right to due process and a fair trial by failing to provide certain jury instructions. Specifically, Petitioner contends that the trial court improperly failed to instruct the jury that a defendant's honest and reasonable belief that another person has consented to sexual conduct serves as a defense to the sex offense charge of which he was convicted.

### A.     Legal Standard

The Due Process Clause of the Fourteenth Amendment requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case.  *See, e.g., Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (as amended) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence); *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (failure to give instruction on exception to special circumstance felony murder violated defendant's due process right to present complete defense).  But due process does not require that an instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611-12 (1982) (holding that a lesser included offense instruction need not be given unless the evidence would support convicting on the lesser offense and acquitting on the greater offense).  "[A] state trial court's finding that the evidence does not support a claim [] is entitled to a presumption of correctness on federal habeas review." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing *Hartman v. Summers*, 120 F.3d 157, 161 (9th Cir. 1997)).

"A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. The error must so infect the entire trial that the defendant was deprived of his right to a fair trial guaranteed by the due process clause of the fourteenth amendment." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 2006).  Furthermore, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  The "burden is especially heavy" for a habeas petitioner whose claim involves a failure to give a particular instruction.  *Id.*  If a court finds a constitutional error, it must then determine whether the error had a substantial and injurious effect or

influence on the jury's verdict before granting habeas relief. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam), *citing Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

**B.     Analysis**

Petitioner claims that the trial court erred by failing to instruct the jury that an honest and reasonable belief in consent is a defense to the charge of forcible oral copulation (CALJIC No. 10.65), under *People v. Mayberry*, 15 Cal. 3d 143, 155 (1975).  At the time of trial, CALJIC No. 10.65 stated:

> In the crime of unlawful ... [oral copulation by force and threats] ..., criminal intent must exist at the time of the commission of the crime charged.
>
> There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in ... [oral copulation] ....  Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge.  However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief.
>
> If after consideration of all of the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the ... [oral copulation] ..., you must find him ... not guilty of the crime.

This instruction is premised on mistake of fact, and "should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." *People v. Williams*, 4 Cal. 4th 354, 362 (1992).  Under California law, "[i]f the defense evidence is unequivocal consent and the prosecution's evidence is of nonconsensual forcible sex, the instruction should not be given." *People v. Burnett*, 9 Cal. App. 4th 685, 690 (1992).

In addition to being honest and in good faith, a defendant's mistaken belief that the victim consented to sexual activity must be objectively reasonable. *Williams*, 4 Cal.

9

4th at 360-61. That is, "the belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." *Id.* at 361. The California Supreme Court has explicitly rejected the possibility that the *Mayberry* instruction should be given in every case where actual consent is offered as a defense to rape or other sexual assault. *Id.* at 362 n.7.

The California Court of Appeal found no substantial evidence in the record that warranted a *Mayberry* instruction. *Castillo*, 2005 WL 236837 at *8. The Court of Appeal noted that Petitioner did not testify at trial, and thus did not provide his version of the facts of the encounter with the victim and primarily relied on the testimony of the victim, Joanna, to establish that her conduct could reasonably have been misinterpreted as giving consent to sexual activity. *Id.* at *6. According to her testimony at trial, she did accompany Castillo to an abandoned hospital room, drink alcohol with him, and willingly kiss him. (RT 1789-97.) After this point, however, the victim testified that she told Castillo to stop, locked her legs closed, and that Castillo overpowered her, pulling off her clothes and raping her. (RT 1798-1806.) She testified that hen he inserted his penis into her mouth, she threatened to bite it off. (RT 1806-07.)

In *People v. Williams*, 4 Cal. 4th 354, 363 (1992), the California Supreme Court reversed a Court of Appeal holding that a woman willingly accompanying a man to a hotel room could serve as a basis for an honest and reasonable, but mistaken, belief that she had consented to sexual activity. The Court specifically disapproved of "the obsolete and repugnant idea that a woman loses her right to refuse sexual consent if she accompanies a man alone to a private place." *Id.* Under the version of facts established at trial, if Joanna's initial actions were in any way ambiguous, she removed any remaining ambiguity when Castillo attempted to have sexual intercourse with her. Therefore, the Court of Appeal ruled that under California law, Joanna's actions could

not support a reasonable inference of consent to sexual activity. *Castillo*, 2005 WL 236837 at *7-8.

Petitioner's defense at trial focused almost exclusively on contradicting Joanna's testimony and impeaching her character. The defense theory, as set forth in defense counsel's closing argument, was that Joanna consented enthusiastically to the sexual activity and subsequently lied about her consent and nearly every other detail. (RT 3519-22.) Counsel did not argue that the victim's behavior was ambiguous. As in *Burnett*, the defense evidence was of unequivocal consent and the prosecution's evidence was of clearly nonconsensual forcible sex. The Court of Appeal found here that given the lack of "substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not," the trial court properly refused to give the *Mayberry* instruction. *Castillo*, 2005 WL 236837 at *6.

Although Petitioner "is entitled to adequate instructions on the defense theory of the case," *Conde*, 198 F.3d at 739, the record fails to establish that Petitioner was relying on the *Mayberry* defense of honest and reasonable mistake as to consent on the facts here. Petitioner's counsel argued at trial that Joanna consented unequivocally to the sexual activity. Therefore, Petitioner was not deprived of his "meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 485.

Additionally, because such an instruction was not warranted by the evidence in the record, the trial court's failure to give the instruction did not violate Petitioner's due process rights. *See Hopper*, 456 U.S. at 611-12. Under the presumption of correctness that is given to a state court's determination that the evidence does not support a particular jury instruction, the Court of Appeal's holding was not an unreasonable application of federal law. *Menendez*, 422 F.3d at 1029. Petitioner has not met the "especially heavy" burden of showing that he was deprived of a fair trial by the trial

11

court's failure to give this instruction, and therefore is not entitled to habeas relief. *Henderson*, 431 U.S. at 155.

## **CONCLUSION**

After a careful review of the record as a whole and the applicable law, the petition for writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: June 24, 2009

JEFFREY S. WHITE
United States District Judge

|   |   |
|---|---|
| | UNITED STATES DISTRICT COURT |
| | FOR THE |
| | NORTHERN DISTRICT OF CALIFORNIA |

CURTIS M CASTILLO,

    Plaintiff,

  v.

M S EVANS et al,

    Defendant.
_____/

Case Number: CV06-04841 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 24, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Curtis Mitchell Castillo
T95996
Salinas Valley State Prison
P.O. Box 1050
Soledad, CA 93960-1020

Dated: June 24, 2009

*Jennifer Ottolini*
Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk